# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ramon Luna Bueno, | No. CV 16-03450-PHX-DGC (JZB) |
| Plaintiff, | |
| v. | **AMENDED ORDER** |
| J. Chang, et al., | |
| Defendants. | |

Plaintiff Ramon Luna Bueno, through counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Sheriff's Deputy Don Marchand, Maricopa County Sheriff Paul Penzone, and Maricopa County move for summary judgment (collectively, "County Defendants"). (Doc. 105). Defendants J. Chang, B. Esperum, Keith Garn, C. Holton, C. Howard, B. Morris, and B. Wetzel (collectively, "City Defendants" separately move for summary judgment. (Doc. 107.) Plaintiff opposes both Motions. (Docs. 114, 122.)

The Court will grant the County Defendants' Motion for Summary Judgment in its entirety and grant in part and deny in part the City Defendants' Motion for Summary Judgment.

## I. Background

On screening the First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated claims in Count Two against the City Defendants for failure to intervene; in Count Four against the City Defendants for excessive force; in Count Five

against the County Defendants for inadequate medical care; and in Count Six against the County Defendants for delaying or preventing legal visits from Plaintiff's retained civil attorney. (Doc. 25.) The Court directed those Defendants to answer the claims and dismissed the City of Phoenix and the remaining claims. (*Id.*)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III. Facts**

The following facts are taken from the parties' respective Statements of Fact and Declarations. Where the facts are in dispute, the Court has used Plaintiff's version of the facts. *See Anderson*, 477 U.S. at 225.

**A. Plaintiff's Arrest**

On October 8, 2014, while conducting a traffic stop in the City of Phoenix, an Arizona Department of Public Safety (DPS) officer, Officer Casey, was shot in the face. (Doc. 108 at 2 ¶ 1.) The individual who shot Officer Casey, who officers believed to be Plaintiff, fled from the scene. (*Id.* ¶ 2.) After attempting to locate Plaintiff for almost a week, on October 15, 2014, detectives from the Phoenix Police Department (PPD) Major Offender Bureau obtained information that Plaintiff could be found at a residence on Vista Avenue in Phoenix. (*Id.* ¶ 3.) Because Plaintiff was believed to be armed and dangerous, several other PPD units, including the Special Assignments Unit (SAU), responded to assist the detectives "in a tactical operation" to take Plaintiff into custody. (*Id.* ¶ 4.) Law enforcement officers from several other agencies, including DPS, the Maricopa County Sheriff's Office (MCSO), the Bureau of Alcohol, Tobacco and Firearms (ATF), the Federal Bureau of Investigation, and the U.S. Marshal's Service, were also at the scene. (*Id.* ¶ 5.)

At approximately 6:30 p.m. on October 15, 2014, the various City of Phoenix police officers who responded to the Vista Avenue house set up a perimeter and surrounded the house in preparation for taking Plaintiff and potentially other individuals who were in the house into custody. (*Id.* ¶ 6.) Defendant Wetzel is an SAU officer and was assigned as the primary negotiator at the Vista Avenue residence. (*Id.* ¶ 7.) Wetzel was positioned inside a "Bear" armored vehicle, which was parked in the driveway in the front of the residence. (*Id.* ¶ 8.) Defendant Esperum was assigned to SAU at the time of Plaintiff's arrest, and his primary position was as a negotiator. (*Id.* ¶ 9.) Esperum was positioned behind the Bear armored vehicle. (*Id.*) Defendants Chang and Holton were SAU officers who were

positioned as snipers on a rooftop behind the residence to provide information and support for the officers who were on the ground attempting to take Plaintiff into custody. (*Id.* ¶ 10.) Defendant Howard is a City of Phoenix Police K-9 Officer. (*Id.* ¶ 11.) When Howard arrived at the residence, he positioned himself and his K-9 behind the Bear armored vehicle. (*Id.* ¶ 12.) Defendant Garn was a patrol officer with a collateral assignment to SAU as a hostage negotiator. (*Id.* ¶ 13.) Garn responded to the scene as part of the negotiation team, but when he arrived, Plaintiff had already been handcuffed. (*Id.* ¶ 14; Doc. 108-1 at 20.) Defendant Morris was a patrol officer with a collateral assignment to SAU as a hostage negotiator and responded to the scene as part of the negotiation team. (Doc. 108 ¶ 15.) Morris was one of the last officers to arrive at the scene, and by that time, Plaintiff had been taken into custody. (Doc. 108-1 at 23.)

On October 15, 2014, Plaintiff went to the Vista Avenue residence to visit a woman whom he knew only as "Mousey." (Doc. 108 ¶ 16.) Mousey was not at the house, but other occupants of the house told Plaintiff that she would be returning soon, and he could wait for her there. (*Id.* ¶ 17.) Plaintiff was living on the streets at that time, and the other occupants told him he could do some laundry at the house while he was waiting for Mousey. (*Id.* ¶ 18.) Plaintiff was doing laundry in the carport and had put some of his clothing items on a clothesline in the backyard, and when he later went into the backyard to see if his clothes were dry, he heard someone say, "Freeze." (*Id.* ¶ 19.)

When Plaintiff was in the carport of the Vista house and became aware of others in the darkness, he was not initially aware that they were law enforcement officers. (Doc. 115 ¶ 5.) An officer with a flashlight and a gun pointed it at Plaintiff, and he ran to the front of the house, where there were "all kinds of police officers," who told him to "freeze." (*Id.* ¶ 6.) Plaintiff went to a nearby wall, raised his hands above his head, and spread his legs. (*Id.*) Defendant Wetzel saw Plaintiff walk into the carport. (Doc. 108 ¶ 22.) Defendant Esperum saw Plaintiff by the east wall of the carport next to the house. (*Id.* ¶ 23.) Wetzel, Esperum, and Defendant Chang all saw Plaintiff put his hands on the wall of the house under the carport in response to commands by other officers. (*Id.* ¶ 24.) Esperum

- 4 -

heard other officers near him at the back of the Bear armored vehicle give Plaintiff commands to walk to their location. (*Id.* ¶ 25.) Wetzel and Howard saw Plaintiff walk toward officers who were positioned behind the Bear armored vehicle. (*Id.* ¶ 37.)

The City of Phoenix Police Report states that as the armored vehicles moved into position, "a male subject could be seen standing in the carport located on the west side of the house. Officers gave commands to the subject who complied and placed his hands on the wall of the house until he was further directed to be taken into custody." (Doc. 115 ¶ 7.) According to Plaintiff, officers gave Plaintiff "contradictory commands"; officers in the back told Plaintiff not to move, while officers in the front told him to come to the front. (*Id.* ¶ 8.) Plaintiff saw a laser pointer "going towards his head," and there was a "big floodlight" on him. (*Id.* ¶ 9.) Plaintiff told the officer in the front to "come and get [him]" because the officer in the back was telling him to stay. (*Id.* ¶ 10.) The officer in the front "finally came and got [him]," handcuffed him, turned him around, looked at him, and said, "that's him, that's him." (*Id.*)

Defendant Howard avows in his Declaration that he saw Plaintiff being handcuffed by other officers "without incident and without any force being used." (Doc. 108 ¶ 38; Doc. 108-1 at 16.) Esperum does not recall having any physical contact with Plaintiff, but he believes it is possible he placed handcuffs on Plaintiff because he was near Plaintiff when the handcuffing occurred. (Doc. 108 ¶ 39.) After Plaintiff was handcuffed, he "was lifted into the air," and officers started "beating [him] up." (Doc. 115 ¶ 11.) Officers took Plaintiff toward a cul-de-sac and a dark "tactical SUV," slammed him on the street face down, and started "beating and torturing him." (*Id.* ¶ 12.) The officers had an unmuzzled K-9, which they held inches from Plaintiff's face. (*Id.*) The K-9 "barked and barked," and Plaintiff felt threatened by it. (*Id.*) However, the K-9 did not use any force against Plaintiff, and the K-9 did not come into contact with him. (Doc. 108 ¶ 53.) The officers continued to "beat on" Plaintiff but paused to ask him, "where is Danny Vargas[?]" (Doc. 115 ¶ 14.) Plaintiff said he did not know, and "the beating resumed." (*Id.*)

The officers "talked shit" to Plaintiff and continued kicking and stomping him. (*Id.*

¶ 15.) The officers flipped him over, and one officer "grabbed the middle of the handcuffs and [] started pulling it back like [he was] trying to find out if [Plaintiff] was double-jointed." (*Id.*) The officer "started putting pressure on pressure," there was a "pop" in Plaintiff's shoulder, and the officer let go. (*Id.*) An officer was "stomping" on Plaintiff's head while the second officer was pulling back on the handcuffs. (*Id.* ¶ 16.) A female detective kicked Plaintiff in the face. (*Id.* ¶ 17.) After Plaintiff's shoulder popped, he was flipped over again, and "the same guy that was stomping on [his] head started stomping in the middle of [his] chest." (*Id.* ¶ 18.) Plaintiff was only able to identify the officer by his "floppy fishing type of hat." (*Id.* ¶ 19.) Another officer positioned Plaintiff's leg over the curb, and a second officer began stomping on Plaintiff's knee. (*Id.* ¶ 20.) Defendant Esperum states in his Declaration that he did not use any force on Plaintiff other than possibly assisting with or placing handcuffs on his wrists. (Doc. 108 ¶ 40; Doc. 108-1 at 7.)

Most of the officers present were dressed in black, but some were dressed in plain clothes with their badge suspended on a chain. (Doc. 115 ¶ 21.) All SAU personnel who were involved in this incident were dressed in "full tactical police uniforms," including tactical ballistic vests containing police placards that clearly identified the officers as police. (*Id.* ¶ 22.) Plaintiff was "thrown into" a black SUV and taken directly to Phoenix Police Headquarters. (*Id.* ¶ 23.) Plaintiff was "pleading and yelling for help," but all the officers present laughed." (*Id.* ¶ 24.) The officers were "laughing and joking and talking about, oh, you ain't so tough now, you ain't so tough now." (*Id.*) Plaintiff "yelled real loud" and asked for help, but nobody ever came. (*Id.*)

After his arrest, Plaintiff was charged in Maricopa County Superior Court case #CR2014-149887 with attempt to commit first-degree premeditated murder, aggravated assault, drive-by shooting, possession of a weapon by a prohibited possessor, and threatening or intimidating.[1]

---

[1] *See* http://www.superiorcourt.maricopa.gov/docket/CriminalCourtCases/caseInfo.asp?caseNumber=CR2014-149887 (last accessed Sept. 11, 2019). The Court takes judicial notice of Plaintiff's criminal charges.

### B. Plaintiff's Injuries and Medical Treatment

Prior to these events, on October 8, 1998, Plaintiff fell in the shower and injured his left shoulder. (Doc. 108 at 12 ¶ 73; Doc. 115 at 3 ¶ 23.) On June 21, 2014, Plaintiff dislocated his shoulder when he fell off a bicycle. (Doc. 108 ¶ 74; Doc. 115 ¶ 23.) Plaintiff had surgery on his shoulder, and it healed completely "about a month" after the bicycle accident and was "normal." (Doc. 115 ¶ 29.) Subsequently, Plaintiff was in good health and was free from back pain and other injuries. (*Id.* ¶ 31.)

After Plaintiff's arrest on October 15, 2014, the Phoenix Fire Department responded to Phoenix Police Headquarters, where Plaintiff was being held and interrogated. (*Id.* ¶ 39.) Plaintiff's chief complaints were a headache and left shoulder separation. (*Id.*) Paramedics noted a right-side forehead abrasion and "shoulder dislocation – obvious [deviation]." (*Id.* ¶ 40.) Plaintiff was transported to St. Luke's Medical Center by Phoenix Police officers shortly after being checked by the Fire Department. (*Id.* ¶ 52; Doc. 106 ¶ 2.) Dr. Mark Mathurin medically cleared Plaintiff for jail and noted that Plaintiff had a left shoulder separation that "appear[ed] old." (Doc. 106 ¶ 2.)

Plaintiff sustained some cuts, "lots of bruises," a gash on his right shoulder, and a torn ligament in his left shoulder, and his left collarbone popped out. (Doc. 115 ¶ 26.) Plaintiff also "claimed to have sustained an injury to his ACL on his left knee." (*Id.*) Over the next 30 days after being booked into jail, Plaintiff was evaluated and/or treated by Correctional Health Service (CHS) medical personnel. (Doc. 106 ¶ 4.) Specifically, on October 16, 2014, an initial health assessment was performed; on October 18, 2014, Plaintiff saw a nurse and complained of muscle strains and pain in his back, neck, and legs; on October 25, 2014, Plaintiff saw a nurse and complained of back pain; on October 31, 2014, Plaintiff saw a nurse and complained of shoulder, neck, and back pain; on November 3, 2014, a provider reviewed the records from St. Luke's and noted that no orthopedic referral was indicated; on November 18, 2014, Plaintiff was seen for pain in his left shoulder/arm, the back of his neck, and his left leg and lower back; on November 20, 2014, x-rays of Plaintiff's left knees were taken to rule out a fracture and were negative for signs

of fracture, dislocation, subluxation, or other significant bony abnormality; on November 24, 2014, Plaintiff saw a nurse and complained of chest pain allegedly related to being stomped on the chest during his arrest; on December 1, 2014, Plaintiff saw a nurse for chest pain; on December 2, 2014, Plaintiff was seen in the clinic for follow-up regarding pain and x-rays; and on December 2, 2014, a provider reviewed the radiology report. (*Id.*)

Plaintiff testified that every time he completed a Health Needs Request (HNR) requesting medical attention, he was seen by medical personnel. (Doc. 106-1 at 204.) Plaintiff also testified that no detention officer ever prevented him from receiving medical attention. (*Id.* at 197.) Plaintiff admits he received "quite a bit" of medical care while in Maricopa County custody. (*Id.* at 205.)

Plaintiff sustained a left anterior cruciate ligament (ACL) tear that was confirmed on physical examination and by an MRI. (Doc. 115 ¶ 41.) On August 26, 2015, Dr. James Andry successfully performed ALC reconstruction surgery. (*Id.* ¶ 42.) Plaintiff also sustained a grade III AC joint separation with acromioclavicular joint arthropathy, which was confirmed by an MRI and x-rays. (*Id.* ¶ 43.) On May 23, 2016, Dr. Amon Ferry successfully performed surgery on Plaintiff's left shoulder. (*Id.* ¶¶ 44-45.)

After his arrest, Plaintiff's shoulder bone was "sticking up." (*Id.* ¶ 30.) The bone was "not like that" after it had been repaired following the June 2014 bicycle accident. (*Id.*) The injuries to Plaintiff's shoulder impaired his ability to engage in normal activities "for a while." (*Id.* ¶ 27.) He experienced "a lot of pain" in his shoulder, and it was difficult to walk. (*Id.*) Plaintiff continues to experience pain in his left shoulder and left knee. (*Id.* ¶ 28.)

### C.   Plaintiff's Visits with Civil Rights Counsel

Plaintiff is housed in the Fourth Avenue Jail's most secure unit, the Special Management Unit (SMU). (Doc. 105 at 4.) SMU is reserved for detainees believed to pose the highest possible threat to the safety and security of the Jail based on the detainee's present charges and past convictions and his past and current institutional behavior. (*Id.*) On October 13, 2015, Plaintiff's counsel in this case, Jimmy Borunda, attempted to visit

Plaintiff at SMU. (Doc. 123 at 4 ¶ 1.) Plaintiff's family had contacted Borunda, and the purpose of the October 13 visit was to inquire if Plaintiff wanted counsel to represent him in a civil lawsuit. (*Id.*) The visit was a cell-side visit, which requires visitors to walk down a hallway between the rows of individual cells to a detainee's cell. (*Id.* at 6 ¶ 21.) During a cell-side visit, the visitor visits the detainee from the dayroom by passing through the "rec room," which was shared with another detainee. (*Id.* ¶ 22.) Each cell in the Jail has a two-way speaker, and during a cell-side visit, a detention officer stands outside the slightly-opened door to the hallway. (*Id.* at ¶¶ 23, 25.) Detainees may exchange legal documents via a food trap door, but the food trap door remains closed during cell-side visits and can only be opened upon request by a detention officer who facilitates the transfer of documents and inspects them for contraband. (*Id.* at 2 ¶ 4.)

During the cell-side visit on October 13, 2015, it was "extremely hard" for Borunda to hear Plaintiff because of the noise; Borunda and Plaintiff "had to yell back and forth." (*Id.* at 4 ¶ 2.) A "very loud" air conditioning vent was positioned near Plaintiff's cell, and Borunda and Plaintiff "were required to speak up through a grate" in the door separating the cell and the day room. (*Id.* at 7 ¶ 26.) Detention officers were "constantly passing by" and there was no privacy. (*Id.* at 4 ¶ 2.) Borunda asked a detention officer if he could visit with Plaintiff in the legal room, but the detention officer denied the request and stated that he had "orders to follow." (*Id.* ¶ 3.)

On October 14, 2015, Borunda returned to the Fourth Avenue Jail for another legal visit. (*Id.* ¶ 4.) Borunda "was harassed" by staff, who "tried to check his credentials to see if he was a lawyer." (*Id.* at 7 ¶ 29.) The guards at the main entrance denied Borunda access to Plaintiff because Borunda was not "the attorney of record." (*Id.* at 4 ¶ 4.) Borunda explained that he was Plaintiff's civil attorney, and the guards asked for documentation of Plaintiff's civil case. (*Id.* ¶ 5.) When the guards "learned no complaint had been filed," they denied Mr. Borunda access, although they had previously granted a cell-side visit. (*Id.*) On October 17, 2015, Borunda attempted to make arrangements for a legal visit with Plaintiff. (*Id.* ¶ 6.) The same day, Plaintiff filed a grievance concerning the denial of a

legal room visit. (*Id.* at 7 ¶ 35.) After Plaintiff filed the grievance, two intelligence officers told Plaintiff that Borunda would be allowed to visit cell-side. (*Id.* at 8 ¶ 36.)

On October 23, 2015, Borunda received a phone call from Sergeant Brown, who told Borunda that he could not visit with Plaintiff "in any form" because he was not the attorney of record. (*Id.*) On October 26, 2015, Borunda received a phone call from Sergeant Pedone, who informed Borunda that he was "checking for approval" for visitation with Plaintiff. (*Id.* ¶ 7.) On October 28, 2015, Borunda received a call from Captain Scott Vail, who told Borunda that he could visit Plaintiff via video or through a cell-side visit outside of Plaintiff's cell. (*Id.* at 5 ¶ 9.) Borunda tried to explain why a cell-side visit was unacceptable, and Vail stated that he "got those orders from Don Marchand." (*Id.*) On October 29, 2015, Plaintiff received a note that stated his attorney would be allowed to visit him, but he claims "they still didn't let him come and visit." (*Id.* at 8 ¶ 44.)

Over the next several months, Borunda left phone and email messages for Vail. (*Id.* at 5 ¶ 10.) On April 4, 2016, Vail responded that Marchand had reviewed the visitation request and that Borunda could only visit Plaintiff via cell-side or video visitation. (*Id.*) The same day, Borunda responded to Vail's email and copied Marchand. (*Id.* ¶ 11.) Borunda explained that a cell-side visit did not fulfill Plaintiff's constitutional right to a confidential, attorney-client privileged visit and that video visitation "does not permit the establishment of personal trust." (*Id.*)

On April 7, 2016, Borunda sent Marchand an email, explaining that cell-side visits and video visits were unacceptable. (*Id.* ¶ 12.) On April 15, 2016, Borunda sent a similar email to Marchand. (*Id.*) The same day, Marchand called Borunda. (*Id.* ¶ 13.) Marchand stated that he had already responded to Borunda's request for a confidential legal visit with Plaintiff on several occasions through Vail and that his position was not going to change. (*Id.*) Borunda asked Marchand to put his "firm denial" in writing by responding to his e-mail, and Marchand refused and told Borunda he was "playing a game by trying to get him to respond in writing." (*Id.*) Marchand told Borunda to "take him to court or get him in front of a judge because his position was not going to change." (*Id.*)

1   After a change in administration at MCSO, Borunda tried to visit Plaintiff on August
2   13, 2017 but was "refused a legal room visit." (*Id.* ¶ 14.) Borunda filed a motion for
3   injunctive relief in this Court on August 17, 2017. (*Id.* at 6 ¶ 15; Doc. 20.) Maricopa
4   County filed a response to the motion, claiming the restrictions were imposed with proper
5   intentions, but "further review show[ed] them to be unnecessary." (Doc. 123 at 6 ¶ 16;
6   Doc. 21.) Borunda "received assurances" from counsel for the County that he could visit
7   Plaintiff without restrictions. (Doc. 123 at 6 ¶ 17.) By August 31, 2017, the former
8   restrictions were rescinded, and Plaintiff was permitted to use the legal room for attorney
9   visits. (Doc. 105 at 4.)
10      On June 10, 2018, Borunda attempted to visit Plaintiff to discuss his answers to
11  interrogatories propounded by the City, obtain Plaintiff's signature on medical reviews,
12  and review some attorney-client correspondence. (Doc. 123 at 6 ¶ 18.) Borunda was
13  escorted to the close custody section, where he met Officer Nelson. (*Id.* ¶ 19.) Nelson
14  "refused to permit a legal room visit" with Plaintiff and offered him a cell-side visit instead.
15  (*Id.*) Nelson could not provide a reason for the reversal from the previous practice and
16  assurances of counsel for the County, except that he had "orders" from a "supervisor." (*Id.*)
17      Plaintiff was only able to see Borunda once during a cell-side visit before the
18  original Complaint was filed; other than that, Plaintiff was only able to communicate with
19  counsel via phone and mail. (*Id.* at 6 ¶ 20; *id.* at 8 ¶¶ 41, 45.) Plaintiff was unable to
20  approve or disapprove the First Amended Complaint before it was filed, and he was unable
21  to sign a retainer agreement with Borunda until Borunda was permitted to visit Plaintiff in
22  the legal room. (*Id.* at 7 ¶ 33-34.) Plaintiff only reviewed, but did not answer, the
23  interrogatories propounded by the City because the only way he could assist in answering
24  them was by mail. (*Id.* at 8 ¶ 42.) Plaintiff refused to talk about his case on the phone and
25  he did not want to talk to any of his lawyers in his cell because of the speaker system
26  installed in the cell. (*Id.* ¶¶ 40, 43.)
27  . . . .
28  . . . .

# IV.    Discussion

## A.    Excessive Force – Count Four

### 1.    Fourth Amendment Standard

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine whether the force used was reasonable requires a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). The Court must consider "the facts and circumstances of each particular case." *Id.* at 396. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The Ninth Circuit has set forth a three-part test to determine whether a Fourth Amendment violation has occurred. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010). First, the Court assesses "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted." *Id.* (quoting *Miller v. Clark Cnty*, 340 F.3d 959, 964 (9th Cir. 2003)). Second, the Court evaluates the government's interests by assessing the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* (citing *Miller*, 340 F.3d at 964; *Graham*, 490 U.S. at 396). Third, the Court balances "'the gravity of the

intrusion on the individual against the government's need for that intrusion.'" *Id.* (quoting *Miller*, 340 F.3d at 964.) Ultimately, the Court must determine whether the force used was "'greater than [was] reasonable under the circumstances.'" *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002).

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). An officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

### 2.  Parties' Contentions

The City Defendants first argue that there is no evidence in the record to support a conclusion that any of the City Defendants used any force against Plaintiff during his arrest, let alone excessive force. (Doc. 107 at 8.) They assert that there is no evidence that any of them had any physical contact with Plaintiff, and they all averred in declarations that they did not use any force on Plaintiff during his arrest. (*Id.* at 10.) The City Defendants further contend they cannot be held liable simply because of their "membership in a group without a showing of individual participation in the unlawful conduct." (*Id.* at 8.) The City Defendants further assert that they cannot be held liable for being "merely present" at

the scene of an incident and that Plaintiff must provide evidence of their "integral participation" in the use of force. (*Id.* at 8-9.)

In response, Plaintiff argues that he had no chance to learn the names of the officers who beat him and relied on the police reports disclosed in his criminal case to ascertain the names of the individuals he believed were responsible for his arrest and injuries. (Doc. 114 at 8.) Plaintiff agrees that this case turns on whether any of the City Defendants were "bystanders" or "integral participants" in his arrest. (*Id.*) He contends that Defendants Esperum, Howard, and Wetzel were "integral participants." (*Id.* at 10-13.) Plaintiff concedes the other City Defendants "may not be integral participants because of either their distance from the Bear armored vehicle (Chang and Holton) or their late arrival to the scene (Morris and Garn)." (*Id.* at 13.)

### 3. Analysis

#### a. Integral Participation

A plaintiff cannot hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct. *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). Likewise, an officer cannot be held liable for being "merely present" at the scene of an alleged constitutional violation. *Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002). Rather, an officer's liability under section 1983 is predicated on his "personal involvement" or "integral participation" in the alleged violation. *Chuman*, 76 F.3d at 294-95. "Integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004). However, there must have been some "fundamental involvement" in the conduct that allegedly caused the violation. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).

The Ninth Circuit has disapproved a "team effort" standard for liability because it would "allow[] the jury to lump all the defendants together, rather than require it to base each individual's liability on his own conduct." *Chuman*, 76 F.3d at 295. Although the Ninth Circuit has not foreclosed the possibility of group liability in certain "very limited

circumstances," the Ninth Circuit has indicated that such liability would only be proper where the actions of police officers deprive the plaintiff of any chance to learn exactly which officer took what actions because the officers were the only ones who knew what occurred. *Jones*, 297 F.3d at 938.

Plaintiff argues in his Response to the City Defendants' Motion for Summary Judgment that the Ninth Circuit has "stepped back" from *Jones*. (Doc. 114 at 9.) He contends that the possession and/or use of weapons and a show of force by backup officers at the scene of a constitutional violation "are often the touch stones of integral participation and liability for the entire group." (*Id.*)

The evidence in the record demonstrates that many officers from multiple agencies were present during Plaintiff's arrest, and Plaintiff knew what occurred during his arrest, even if he could not identify what any particular officer did during the assault. Therefore, the Court finds that the City Defendants were not the only officers who knew what occurred during Plaintiff's arrest. Even assuming a group liability theory is ever viable, the evidence in the record does not support group liability in this case; therefore, the Court turns to whether any of the City Defendants can be found individually liable based on the evidence herein presented.

### (1)   Chang, Holton, Morris, and Garn

Plaintiff concedes that Defendants Chang, Holton, Morris, and Garn "may not be" integral participants in his arrest. (Doc. 114 at 13.) The Court agrees that the record does not demonstrate that Chang, Holton, Morris, and Garn were sufficiently personally involved in Plaintiff's arrest to be liable on an excessive force claim. As to these Defendants, the record shows only that Chang and Holton were on the rooftop of the Vista Avenue residence. (Doc. 108-1 at 11, 14.) Morris and Garn arrived at the scene after Plaintiff was arrested. (*Id.* at 20, 23.) Therefore, the Court will grant the City Defendants' Motion for Summary Judgment in favor of Defendants Chang, Holton, Morris, and Garn on Count Four.

. . . .

### (2)  Wetzel

Defendant Wetzel asserts that he was inside the Bear armored vehicle that was parked in the driveway in front of the residence. (Doc. 108-1 ¶ 9.) Wetzel saw Plaintiff walk out of the house and into the carport and then saw Plaintiff walk toward officers who were positioned behind the Bear armored vehicle. (*Id.* ¶¶ 10-12.) Plaintiff testified that he was taken toward the cul-de-sac and in the direction of a dark "tactical SUV car," which according to Plaintiff, "presumably [was] the Bear armored vehicle where [] Wetzel claims he was positioned." (Doc. 114 at 12.) Wetzel, like the other City Defendants, was dressed all in black tactical gear and had a weapon. (Doc. 115-1 at 14, 32.)

Plaintiff contends that Wetzel's "show of force and armaments coupled with his physical proximity" to where Plaintiff was arrested "is sufficient evidence for a jury to infer that he was an integral participant" in Plaintiff's arrest. (Doc. 114 at 12.) The Court disagrees. Wetzel's mere proximity to the location where Plaintiff was arrested is not sufficient to demonstrate Wetzel's "fundamental involvement" in Plaintiff's arrest. Moreover, there is no evidence in the record that Plaintiff saw Wetzel inside the Bear armored vehicle. Plaintiff testified that when he went to the back yard, "there were all kinds of people in the back wearing all black holding guns," and those officers took him toward the cul-de-sac to the Bear armored vehicle. (Doc. 115-1 at 32.) Although Plaintiff alleges that the window of the Bear armored vehicle allowed Wetzel to see Plaintiff, he did not testify that he saw anyone inside the Bear armored vehicle who had a weapon. Therefore, Plaintiff's argument that Wetzel was "dressed all in black tactical gear and had a weapon" does nothing to distinguish him from the many other officers on scene or to support his assertion that Wetzel was an "integral participant" in Plaintiff's arrest.

Based on this record, the Court finds there is no evidence from which a reasonable jury could find that Defendant Wetzel was personally involved in Plaintiff's arrest. The Court will therefore grant the City Defendants' Motion for Summary Judgment in favor of Defendant Wetzel with respect to Count Four.

. . . .

### (3)    Howard and Esperum

Defendant Howard avers that he positioned himself and his K-9 behind the armored vehicle that was parked in the driveway in front of the residence. (Doc. 108-1 at 17.) Howard further asserts that he saw Plaintiff walk out from under the carport and saw other officers handcuff Plaintiff without incident and without any use of force. (*Id.*) Howard states that neither he nor his K-9 had any contact with Plaintiff at the scene of his arrest. (*Id.*) However, Plaintiff has asserted, based on his personal knowledge, that Howard held his unmuzzled K-9 inches from Plaintiff's face while Plaintiff lay on the ground and that Plaintiff "felt threatened" by the K-9. (Doc. 115 ¶ 12.) Plaintiff contends Howard is an integral participant because he and his K-9 provided "perceived force" to Plaintiff in the "endeavor to keep him still." (Doc. 114 at 11.) Plaintiff asserts that a reasonable juror could find that Howard and the K-9 were integral participants in Plaintiff's arrest because they "secured compliance under threat of canine attack." (*Id.*)

In *Blankenhorn*, the Ninth Circuit denied summary judgment to an officer who helped in handcuffing a prone defendant by holding his arm and to an officer who ordered the use of restraints. 485 F.3d at 469 n.3, 481. By contrast, the Ninth Circuit found that an officer who arrived on the scene after the arrest was completed and an officer who "at most provided crowd control" did not participate in any integral way in the arrest. *Id.* at 481 n.12. The Ninth Circuit further found that an officer who helped handcuff the plaintiff while he was prone "was instrumental in the officers' gaining control" of the plaintiff, which culminated in the application of hobble restraints. *Id.* The Ninth Circuit concluded that the officer's participation was integral to the use of the hobble restraints. *Id.*

Likewise, in *Flowers v. County of Fresno*, 2009 WL 1034574 (E.D. Cal. Apr. 16, 2009), which Plaintiff cites, the district court determined that the plaintiff had stated an excessive force claim against three officers based on his allegations that the officers handcuffed him and placed him in a patrol car, with the handcuffs tightened, and then ignored the plaintiff's requests to loosen the handcuffs. *Id.* at *2. And, in *Martinez v. Bryant*, 2009 WL 1456399 (C.D. Cal. May 19, 2009), the district court determined that an

officer's conduct in telling another officer to "handle" the plaintiff and holding down the plaintiff's legs could constitute meaningful participation. *Id.* at *7 (citing *Blankenhorn*, 485 F.3d at 469 n.3, 481).

The Ninth Circuit has also concluded that "pointing a gun at a suspect, employing the threat of force, is use of a high level of force" for purposes of a Fourth Amendment excessive force claim. *Espinosa*, 598 F.3d at 537-38. In *Green*, the Ninth Circuit rejected an officer's claim that he could not be held liable for excessive force because he was not one of the officers who had pointed a gun at the plaintiff while she was in handcuffs. 751 F.3d at 1051. The Ninth Circuit found that the officer was "plainly an active participant" because he was restraining the plaintiff. *Id.*; *see also Blankenhorn*, 485 F.3d at 481 n.12; *Boyd*, 374 F.3d at 780 (under the integral participant rule, "an officer who does not enter an apartment, but stands at the door, armed with his gun, while other officers conduct [a] search" can be "a full, active participating in the search").

The Court finds that Howard's involvement is subject to genuine factual dispute. Although it is undisputed that Howard did not point a gun at Plaintiff, holding his K-9 inches from Plaintiff's face could constitute the type of threat of force that would amount to integral participation in the use of force.

Defendant Esperum states that he does not recall having any physical contact with Plaintiff and has no recollection of assisting in placing handcuffs on Plaintiff. (Doc. 108-1 at 7.) Esperum further asserts that he believes it is possible that he did assist in handcuffing Plaintiff because he was near Plaintiff when the handcuffing occurred, but he did not use any force on Plaintiff, other than possibly assisting with or placing handcuffs on his wrists." (*Id.*) Accepting as true Plaintiff's factual assertions concerning the force used during his handcuffing and subsequent assault, the Court finds there is a genuine dispute of material fact concerning Esperum's personal involvement in Plaintiff's arrest.

### b. Objective Reasonableness Inquiry

#### (1) Nature of the Force Inflicted

The Court must first evaluate "the type and amount of force inflicted." *Espinosa*,

598 F.3d at 537 (quotation omitted). "[E]ven where some force is justified, the amount actually used may be excessive." *Santos*, 287 F.3d at 853. Plaintiff has asserted, through his personal knowledge, that after he was handcuffed, he "was lifted into the air," beaten, slammed face down on the street, and kicked in the face. Plaintiff has also asserted that officers stomped on his head and chest, and that his shoulder was dislocated after officers grabbed the middle of the handcuffs and put pressure on them.

The Court must also consider whether alternative methods were available for subduing Plaintiff. *See Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir. 1994). Police officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Glenn v. Wash. Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). But "police are 'required to consider [w]hat other tactics if any were available,'" and whether there were "clear, reasonable and less intrusive alternatives" to the force employed, that "militate against finding [the] use of force reasonable." *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (citation and quotation omitted)). The parties did not address whether alternative methods were available to subdue Plaintiff.

Based on the evidence in the record, the Court finds there is a genuine dispute of material fact concerning whether the amount of force the City Defendants used was justified.

### (2) Government Interests

When evaluating the importance of the government interest at stake, the Court must first examine the severity of the crime at issue. *Espinosa*, 598 F.3d at 537. More serious crimes may require greater levels of force to apprehend the subject. *See Law v. City of Post Falls*, 772 F. Supp. 2d 1283, 1297 (D. Idaho 2011). Here, Plaintiff was arrested for attempted first-degree murder, three counts of aggravated assault, drive-by shooting, and several other crimes. Accordingly, the Court finds the severity of the crime at issue weighs in favor of the City Defendants.

The second, "most important" factor in the governmental interest inquiry is whether Plaintiff "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). When considering whether there was an immediate threat, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan*, 630 F.3d at 826 (citation and quotation omitted). In this case, Plaintiff was suspected of shooting a police officer in the face and was believed to be armed and dangerous. The Court finds that a reasonable jury could conclude that Plaintiff posed an immediate threat to the safety of the officers or others, and therefore, the second factor weighs in favor of the City Defendants.

Third, the Court considers whether a suspect is actively resisting arrest or attempting to evade arrest by flight. Here, the evidence in the record does not indicate that at the time of his arrest, Plaintiff was "actively resisting" or attempting to evade arrest. Rather, once Plaintiff became aware that the individuals at the Vista Avenue residence were law enforcement officers, he complied with their commands. Accordingly, the Court finds the third factor weighs in favor of Plaintiff.

The Court must balance the competing interests to determine the importance of the governmental interest in the use of force against Plaintiff. The Court finds that, although Plaintiff did not resist or evade arrest, the severity of the crime of which Plaintiff was suspected, coupled with the officers' reasonable belief that Plaintiff was armed and dangerous, weighs in favor of the government's interest in the use of force.

### (3) Necessity of Force

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos*, 287 F.3d at 854). This determination is judged from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396–97. Where there is no need for force, any force used is excessive. *Headwaters Forest Def. v.*

*County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated and remanded on other grounds*, *County of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001).

The Court finds, based on the evidence in the record, that there is a genuine dispute of material fact concerning whether the force used was "greater than reasonable under the circumstances." As the Ninth Circuit recognized in *Smith*, the credibility determinations at issue in an excessive force case are best left to a jury. 394 F.3d at 701.

In sum, the Court finds there is a genuine dispute of material fact with respect to whether Defendants used excessive force against Plaintiff.

### c.    Harm

The City Defendants argue that Plaintiff has failed to present sufficient evidence to support that they caused his injuries. (Doc. 107 at 13.) However, the record establishes there is a genuine dispute of material fact concerning whether Plaintiff suffered harm as a result of the force used during his arrest. Plaintiff's medical expert, Dr. Iliescu, opined that the injuries Plaintiff suffered were consistent with the "mechanism" of Plaintiff's arrest. (Doc. 108-1 at 152.) Dr. Iliescu further opined that Plaintiff's shoulder injury was exacerbated during the handcuffing and lifting of Plaintiff during the arrest. (*Id.*) Dr. Iliescu also opined that although Plaintiff's left shoulder showed some chronic degenerative changes, the degree of the separation accompanied by the severe pain symptoms Plaintiff described "are proof that this injury was at least aggravated by the handling of [Plaintiff's] cuffed wrists during the arrest." (*Id.* at 153.)

With respect to Plaintiff's left knee, Dr. Iliescu wrote in his report that an MRI performed on August 26, 2015 revealed that Plaintiff's ACL was ruptured, and the ligament was torn off at the femoral insertion. (*Id.*) Dr. Iliescu opined that the ACL ligament rupture occurred during the October 15, 2014 arrest. (*Id.*)

On the other hand, the City Defendants' medical expert, Dr. Domer, opined that Plaintiff's medical records reflect an aggravation of his left shoulder injury, but based on the operative report documented by Dr. Ferry, the shoulder surgery "would have been performed in the exact same way for the injuries sustained" in June 2014 bicycle accident,

"even in the absence of the shoulder aggravation." (Doc. 108-1 at 166.) Dr. Domer further opined that Plaintiff's description of his shoulder feeling like it had popped out of the socket would better explain injuries to the glenohumeral joint and supporting ligamentous structures that were not addressed or noted to be a problem during the surgery or Plaintiff's treatment before the surgery. (*Id.*) Thus, Dr. Domer opined that "it is not clear to a reasonable degree of medical certainty" that Plaintiff's shoulder injury was "aggravated" during his arrest. (*Id.*)

Based on the evidence in the record, the Court finds there is a genuine dispute of material fact concerning whether Plaintiff suffered harm as a result of the force used during his arrest. Accordingly, the Court will deny the City Defendants' Motion for Summary Judgment with respect to the Fourth Amendment excessive force claim in Count Four against Defendants Howard and Esperum.

**B.    Failure to Intervene – Count Two**

**1.    Legal Standard**

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd in part on other grounds*, 518 U.S. 81 (1996). If an officer fails to intervene when fellow officers use excessive force, despite not acting to apply the force, he is responsible for violating the Fourth Amendment, *see id.*, if he had a "realistic opportunity" to intercede, *Cunningham*, 229 F.3d at 1289. In determining whether an officer should have intervened to stop a constitutional violation, the Court should consider whether the bystanding officer had the time and opportunity to intervene. *See United States v. Reese*, 2 F.3d 870, 890 (9th Cir. 1993).

**2.    Parties' Contentions**

The City Defendants argue that there is no evidence in the record that any of them had a realistic opportunity to intervene to prevent the violation of Plaintiff's Fourth

Amendment rights. (Doc. 107 at 12.) They again assert that they have provided declarations stating that they did not observe any other officer use force against Plaintiff during his arrest. (*Id.*) In response, Plaintiff argues that Defendants Esperum, Howard, and Wetzel each had a "realistic opportunity" to intercede in his arrest. (Doc. 114 at 13-14.)

### 3.    Analysis

The undisputed evidence in the record demonstrates that Defendants Morris, Chang, Holton, and Garn were not near enough to where Plaintiff was arrested to intercede. Accordingly, the Court finds there is no genuine dispute of material fact concerning whether Morris, Chang, Holton, and Garn had a reasonable opportunity to intercede in Plaintiff's arrest. The Court will therefore grant the City Defendants' Motion for Summary Judgment with respect to the failure-to-intervene claim against Morris, Chang, Holton, and Garn.

Defendant Esperum admits that he might have handcuffed Plaintiff. Therefore, the Court agrees with Plaintiff that there is a genuine dispute of material fact concerning whether Esperum had a realistic opportunity to intervene in any police misconduct that occurred in his presence. Defendant Howard was positioned behind the Bear armored vehicle, where the arrest and assault allegedly occurred. Thus, the Court finds there is a genuine dispute of material fact concerning whether Howard had a realistic opportunity to intervene. Finally, from his position inside the Bear armored vehicle, Defendant Wetzel saw Plaintiff walk into the carport and toward the armored vehicle. This evidence indicates that Wetzel was near enough to where Plaintiff was arrested and had enough time to intervene in his arrest. Accordingly, the Court finds there is a genuine dispute of material fact concerning whether Wetzel had a reasonable opportunity to intervene in Plaintiff's arrest. The Court will therefore deny the City Defendants' Motion for Summary Judgment with respect to the failure-to-intervene claim against Esperum, Howard, and Wetzel.

. . . .

. . . .

### C. Medical Care – Count Five

#### 1. Fourteenth Amendment Standard

The Ninth Circuit Court of Appeals has held that "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)).[2] To prevail on a medical care claim, a pretrial detainee must show

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro*, 833 F.3d at 1071 (quoting *Kingsley v. Hendrickson*, ___ U.S. ___, ___, 135 S. Ct. 2466, 2473 (2015); *Graham*, 490 U.S. at 396).

The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071 (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). A plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

---

[2] The County Defendants erroneously assert that Plaintiff's medical care claim is governed by the Eighth Amendment's deliberate indifference standard. (Doc. 105 at 8.)

### 2.    Analysis[3]

In Count Five, Plaintiff alleges that Defendants Penzone and Marchand interfered with, delayed, or prevented medical treatment for Plaintiff for the injuries proximately caused by the use of force during his arrest. (Doc. 15-1 ¶ 55.) Plaintiff asserts he was not permitted to see a doctor for nearly a month after his arrest, by which time his severe bruising was almost gone. (*Id.* ¶ 31.) Plaintiff claims that on August 26, 2015, he was taken to St. Luke's Hospital for surgery on his left knee, and on May 23, 2016, he was taken to St. Joseph's Hospital for surgery on his left shoulder. (*Id.* ¶¶ 32-33.)

### a.    Marchand and Penzone

There is no evidence in the record that either Marchand or Penzone made an intentional decision regarding Plaintiff's medical care that put Plaintiff at substantial risk of suffering serious harm. Instead, Marchand and Penzone's purported liability is based solely on their positions as supervisors. However, there is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

A supervisor may be liable for failure to act. *See Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (a supervisor may be liable if he participated in or directed the violation or he knew of the violation and failed to act to prevent it); *cf. Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011) ("[a] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates").

---

[3] Plaintiff did not respond to the County Defendants' arguments with respect to Count Five in his Response to their Motion for Summary Judgment. (Doc. 122.) The County Defendants argue that because Plaintiff does not contest their Motion for Summary Judgment as to Count Five, the Motion should be granted as to that claim. Under Rule 56(e), the Court may consider the County Defendants' factual assertions concerning Plaintiff's medical care claim undisputed for purposes of the Motion for Summary Judgment. Whether the Court considers the County Defendants' factual assertions as disputed or undisputed, the Court's determinations with respect to Count Five would be unchanged.

The County Defendants argue that Plaintiff has produced no evidence that his medical conditions were urgent or ones that may produce death, degeneration, or extreme pain. (Doc. 105 at 9.) They contend that Plaintiff's medical records suggest that his conditions were chronic in nature or related to prior injuries or were unconfirmed by an x-ray. (*Id.*) The Court need not determine whether Plaintiff suffered constitutional injury because, even assuming for purposes of this Order that Plaintiff did suffer constitutional injury as a result of the medical treatment he received, there is no evidence in the record that either Marchand or Penzone were even aware of the medical treatment Plaintiff received in Maricopa County custody. Accordingly, the Court finds there is no genuine dispute of material fact concerning Marchand and Penzone's liability as supervisors. The Court will therefore grant the County Defendants' Motion for Summary Judgment in favor of Defendants Marchand and Penzone with respect to Count Five.

### b. Maricopa County

A county is a local government unit that may be sued under § 1983 for violating a person's constitutional rights. *Monell*, 436 U.S. at 690. But a government entity is only liable under § 1983 for its "own illegal acts"; it cannot be vicariously liable for its employees' actions. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)); *see L.A. Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010) (the government entity cannot be liable "solely for the acts of others, e.g., 'solely because it employs a tortfeasor'") (internal quotation omitted).

The County Defendants argue that because Plaintiff's allegations concerning his medical care are against detention officers, rather than healthcare providers, Maricopa County should be dismissed. However, Plaintiff has not sued the Maricopa County Sheriff's Office, as the County Defendants seem to suggest. Rather, as the County Defendants note, it is the County that is responsible for providing medical care to County Jail detainees. *See* Ariz. Rev. Stat. § 11-291(A). Thus, regardless of whether Plaintiff makes allegations against detention officers or healthcare providers, Maricopa County ultimately is responsible for providing medical care, and Plaintiff therefore properly named

Maricopa County as a Defendant. *See Conroy v. Avalos*, CV 08–210-PHX-MHM (ECV), 2008 WL 1989788, at *2 (D. Ariz. May 5, 2008) (Because Maricopa County is responsible for providing medical care to jail inmates, any action against the policies of CHS must be brought against the county); *Rogers v. Maricopa County Sheriff's Office*, CV 07-641-PHX-DGC (DKD), 2008 WL 898721, at *2 (D. Ariz. Mar. 31, 2008) ("Although Arizona places responsibility for operating county jails by law upon the county sheriff, the county is responsible for the provision of medical care to inmates.")

To establish § 1983 liability against a municipality under *Monell*, a plaintiff must show that his constitutional injury was caused by employees acting pursuant to the government entity's policy or custom. *Monell*, 436 U.S. at 690–94; *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008). This requires the plaintiff to show (1) a constitutional deprivation; (2) that the entity had a policy or custom; (3) that the policy or custom amounted to a violation of the plaintiff's constitutional right; and (4) that the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001); *see also Gordon*, 888 F.3d 1118.

The Court again assumes without deciding that Plaintiff has shown that he suffered constitutional injury as a result of his medical treatment while in Maricopa County custody. Even assuming Plaintiff has shown that he suffered constitutional injury, however, he cannot prevail on his municipal liability claim against Maricopa County because he has not shown that his injury was the result of a Maricopa County policy or custom.

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of action or inaction. *Long v. County of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S.

112, 127 (1988). A plaintiff must show that the challenged action is the "standard operating procedure" of the municipality. *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal quotation omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, there is no evidence in the record that Maricopa County made a deliberate choice with respect to establishing final policy regarding the provision of medical care. Accordingly, there is no evidence in the record that Maricopa County had a policy that resulted in Plaintiff's injuries. Moreover, the Court agrees with Dr. Domer's opinion that Plaintiff "had treatment to a high standard, based on the multiple times he was attended to, the two surgeries he had for elective problems, and the timeliness of his treatment." (Doc. 106 ¶ 9.) Accordingly, the Court finds there is no genuine dispute of material fact concerning whether Maricopa County had a custom that resulted in injury to Plaintiff. The Court will therefore grant the County Defendants' Motion for Summary Judgment in favor of Maricopa County as to Count Five.

### D.    Legal Visits – Count Six

Plaintiff alleges that the County Defendants violated his rights under the Fourth, Fifth, and Fourteenth Amendments by prohibiting, interfering with, delaying, or preventing confidential legal visits with his civil rights attorney. (Doc. 15-1 at ¶ 58.) The County Defendants characterize Plaintiff's claim as a Fourteenth Amendment due process claim of denial of access to the courts. (Doc. 105 at 12.)

#### 1.    Legal Standard

Under the First Amendment, prisoners have a right to petition the government for the redress of grievances. *Turner v. Safley*, 482 U.S. 78 (1987). The Supreme Court has grounded the right of access to the courts in the Petition Clause of the First Amendment. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002); *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731 (1983). It is well settled that prison inmates are not stripped

of all First Amendment rights at the prison gate. *See Turner*, 482 U.S. at 84. In addition, pretrial detainees have a constitutionally protected right of access to the courts, grounded in the constitutional guarantees of equal protection and due process. *See Murray v. Giarratano*, 492 U.S. 1, 11 n.6 (1989) ("The prisoner's right of access has been described as a consequence of the right to due process of law, and as an aspect of equal protection."); *see also Lewis v. Casey*, 518 U.S. 343, 354 (1996) (noting that the right to challenge conditions of confinement arose from *Wolff v. McDonnell*, 418 U.S. 539 (1974), which extended the right of access to the courts to civil rights actions brought under 42 U.S.C. § 1983).

However, the right to meaningful access to the courts is not unrestricted and does not mean that an inmate must be afforded unlimited litigation resources. *Id.* at 352-55. Rather, the right of meaningful access to the courts prohibits officials from actively interfering with inmates' attempts to prepare or file legal documents. *Id.* at 350. The right of access to the courts is only a right to bring petitions or complaints to federal court and not a right to discover such claims or even to ligate them effectively once filed with a court. *Id.* at 354. The right "guarantees no particular methodology but rather the conferral of a capability–the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Id.* at 356.

To prevail on an access-to-the-courts claim, a plaintiff must show that he suffered an "actual injury" with respect to contemplated litigation. *Id.* at 349. An "actual injury" is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or present a claim." *Id.* at 348. To show actual injury with respect to contemplated litigation, the plaintiff must demonstrate that the defendants' conduct frustrated or impeded him from bringing to court a nonfrivolous claim that he wished to present. *Id.* at 352-53. "[T]he injury requirement is not satisfied by just any type of frustrated legal claim." *Id.* at 354. The right of access to the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id.* at 355. The

nonfrivolous claim must be a direct or collateral attack on the inmate's conviction or sentence or a challenge to the conditions of his confinement. *Id.*

### 2. Parties' Contentions

The County Defendants argue that jails are not required to provide detainees with the use of a private legal room for attorney visits. (Doc. 105 at 13.) Rather, they assert, detainees need only be permitted "some means" by which they can effectively communicate privately with an attorney "to challenge (i.e. file a lawsuit regarding) the conditions of their confinement." (*Id.* at 14.) The County Defendants also contend that Plaintiff has not demonstrated that the initial denial of contact visits with his civil rights attorney denied him access to his lawyer or prejudiced his access to the courts. (*Id.*) They argue that Plaintiff is a high-profile inmate who is a "validated member of the New Mexican Mafia" and was housed in SMU, the most secure wing of the Fourth Avenue Jail. (*Id.*) In addition, the County Defendants assert that because the SMU legal room does not have a camera, officers are required to frequently look into the room to ensure the occupants with the inmate are safe. (Doc. 137 at 9; Doc. 106 ¶¶ 16-17.) Thus, the County Defendants assert that Borunda initially was restricted from visiting with Plaintiff because Borunda was not the attorney of record formally representing Plaintiff, "as well as other safety and security concerns." (Doc. 105 at 4.)

The County Defendants further assert that the legal room is typically reserved for court-ordered meetings, such as competency evaluations and attorney-client meetings, and therefore, the impact of permitting an inmate to use the legal room to interview potentially multiple lawyers who may want to take on his civil rights case would turn the sole available room "into a potentially unmanageable conference room for the benefit of all SMU inmates." (Doc. 137 at 10; Doc. 106-1 at 148.) Thus, according to the County Defendants, Plaintiff's access to his lawyer was initially limited "for good reason," but he was not "denied access" to his lawyer. (*Id.* at 14-15.) With respect to Plaintiff's alleged injury, the County Defendants argue that Plaintiff's initial inability to use the legal room to visit with his civil rights counsel "clearly did not hinder his ability to communicate the facts of his

case . . .or hinder his ability to file" the Complaint in this case. (*Id.* at 16.)

In response, Plaintiff argues that he was prejudiced by the delays in seeing his civil rights counsel "during [the] most active phase in civil litigation." (Doc. 122 at 5.) Plaintiff contends he has shown that his civil rights counsel's ability to speak with him about the needs and deadlines of this case were impaired because of the visitation restrictions. (*Id.*) He asserts that the restrictions the County Defendants imposed were "random, arbitrary, and capricious," and the County Defendants' justification for the restrictions "is a pretext to cover for retaliation against him for the nature of his charges." (*Id.* at 7.) Plaintiff notes that his criminal defense attorneys were never denied contact visits and contends there is no "rational basis to distinguish 'counsel of record' and counsel who are visiting pre-litigation to prepare the filing of a Complaint." (*Id.* at 10.)

### 3. Analysis

In *Ching v. Lewis*, the Ninth Circuit held that a prisoner's right of access to the courts includes contact visitation with his counsel. 895 F.2d 608, 610 (9th Cir. 1990) (per curiam). However, the Ninth Circuit subsequently held in *Casey*, 4 F.3d at 1523, that a state regulation prohibiting high-risk inmates from having contact visits with their attorneys was a reasonable response to the legitimate concern with preventing escape, assault, hostage-taking, and smuggling contraband. In *Casey*, the Ninth Circuit observed that contact visitation with an attorney is "merely one aspect of the broad and fundamental right of meaningful access to the courts." *Id.*[4]

The County Defendants assert that Plaintiff is a validated gang member who was housed in a unit of the Jail that is reserved for detainees believed to pose the highest possible threat to the safety and security of the Jail. (*Id.*) In addition, as noted above, Plaintiff has been charged with attempt to commit first-degree premeditated murder, three

---

[4] In *Casey*, the Ninth Circuit noted that it had not discussed *Turner* in its decision in *Ching* but had emphasized that the defendants in *Ching* had failed to offer any justification whatsoever for their denial of contact visitation, and the Ninth Circuit had referred to their policy as "arbitrary." *Id.* (citing *Ching*, 895 F.2d at 610). The Ninth Circuit stated that had it applied the *Turner* test in *Ching*, "we no doubt would have found that the first factor of the analysis, the 'rational connection,' was missing." *Id.*

counts of aggravated assault, and drive-by shooting. The County Defendants have also demonstrated that permitting unrestricted contact visits for SMU inmates is not feasible. Although Plaintiff contends the County Defendants' justification for the restrictions on contact visits is mere "pretext," he does not dispute the *facts* the County Defendants assert with respect to his gang membership, his possible threat to safety and security, and the severe nature of the charges against him. The Court finds that the County Defendants have demonstrated that it was reasonable to restrict Plaintiff's contact visits with Borunda because of potential safety and security risks and because unlimited contact visits were logistically impossible. The Court finds the restrictions on Plaintiff's contact visits were not random, arbitrary, or capricious. Accordingly, the Court finds the mere inability to have contact visits with Borunda did not violate Plaintiff's right of access to the courts.

In addition, Plaintiff has not shown that he suffered an actual harm as a result of the restrictions on his visits with his civil rights counsel. Plaintiff concedes that he was permitted to visit with counsel; his only allegation of harm is that they were required to meet cell-side, rather than in a legal room. Moreover, as the County Defendants note, Plaintiff admitted that he utilized all the available methods for communication with Borunda and that he had the ability to review and comment on the proposed complaint before it was filed. (Doc. 106-1 ¶¶ 14-15.) Thus, the Court finds there is no genuine dispute of material fact concerning whether Plaintiff suffered actual injury as a result of the initial restrictions on contact visits with his civil rights counsel.

For the foregoing reasons, the Court finds there is no genuine dispute of material fact concerning Plaintiff's access-to-the-courts claim. Therefore, the Court will grant the County Defendants' Motion for Summary Judgment with respect to Count Six.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to the County Defendants' Motion for Summary Judgment (Doc. 105) and the City Defendants' Motion for Summary Judgment (Doc. 107).

(2)    The County Defendants' Motion for Summary Judgment (Doc.   105) is **granted**.

(3)    The City Defendants' Motion for Summary Judgment (Doc. 107) is **granted in part and denied in part**, as follows:

      (a)    The Motion is **granted** with respect to the failure-to-intervene claim in Count Two as to Defendants Morris, Chang, Holton, and Garn;

      (b)    The Motion is **denied** with respect to the failure-to-intervene claim in Count Two as to Defendants Esperum, Howard, and Wetzel;

      (c)    The Motion is **granted** with respect to the Fourth Amendment excessive force claim in Count Four as to Defendants Morris, Chang, Holton, Garn, and Wetzel;

      (d)    The Motion is **denied** with respect to the Fourth Amendment excessive force claim in Count Four as to Defendants Howard and Esperum.

(4)    Chang, Holton, Garn, Maricopa County, Marchand, Morris, and Penzone are dismissed as Defendants.

(5)    The remaining claims are the failure-to-intervene claim in Count Two against Defendants Esperum, Howard, and Wetzel and the excessive force claim in Count Four against Defendants Howard and Esperum.

(6)    This action is referred to Magistrate Judge Eileen S. Willett to conduct a settlement conference.

(7)    Counsel for the parties must jointly call Magistrate Judge Willett's chambers at (602) 322-7620 within 14 days to schedule a date for a settlement conference.

Dated this 4th day of November, 2019.

*David G. Campbell*

_____

David G. Campbell
Senior United States District Judge